**SUN OIL COMPANY, Plaintiff, v. OHIO TURNPIKE COMMISSION, Defendant.**

Common Pleas Court, Franklin County.

No. 191315. Decided July 8, 1955.

467

Effler, Eastman, Stichter & Smith, Toledo, Vorys, Sater, Seymour, & Pease, Columbus, for plaintiff.

Frank C. Dunbar, Jr., Columbus, for defendant.

## OPINION

By LEACH, J.

This case is now before the Court on defendant's demurrer to the petition on the grounds (1) that plaintiff has not legal capacity to sue (2) that there is a defect of parties defendant and (3) that the petition does not state facts which show a cause of action.

The petition alleges in substance that plaintiff is a foreign corporation duly qualified to do business in the State of Ohio; that it "brings this action as a corporation engaged in the business of refining, manufacturing, distributing and selling petroleum products, including gasoline, motor oil and other products ordinarily used in the operation of gasoline-powered and diesel-powered motor vehicles, and also brings this action in the capacity of a taxpayer for and on behalf of itself and all other taxpayers of the State of Ohio"; that defendant is now engaged in the construction of a turnpike project approximately 241 miles in length, extending from the Ohio-Pennsylvania line to the Ohio-Indiana line designated as "Ohio Turnpike Project No. 1"; that defendant has adopted a plan for the construction and operation of gas stations along said turnpike by which defendant proposes to construct said gas stations and retain title thereto and to lease said gas stations to private operators; that defendant has established eight service areas designated as "service plazas" spaced at varying distances throughout the length of said turnpike; that said plan calls for a pair of gas stations in each "service plaza," one on the north side of the turnpike accessible only to motorists in the west-bound lanes of said turnpike and one on the south

side of said turnpike accessible only to motorists travelling in the eastbound lanes; that under said plan defendant called for bids for the operation of the pair of gas stations for each "service plaza" by which only one bid would be accepted as to each "service plaza" and thus in each location there will be available to the motorists only the petroleum products of a single distributor; that defendant thereby "has not authorized or directed the establishment in each service plaza of competing gas stations or distributors and defendant has thereby prevented reasonable competition by competing distributors in the public interest, all in violation of **Chapter 5537 R. C.**";

That on or about November 4, 1954, defendant announced the acceptance of bids on contracts for the operation of a pair of gas stations to be located on "service plazas" two, three, four, five and six and rejected all bids on "service plazas" one, seven and eight; that plaintiff is informed and believes and therefore avers that defendant has not yet executed or delivered to the successful bidders the formal written contracts for the operation of gas stations on "service plazas" two, three, four, five and six but unless restrained will do so (At hearings before this Court on December 2, 1954, and December 10, 1954, on applications for temporary restraining order and temporary injunction it appeared that such formal written contracts had been executed and delivered to successful bidders prior to filing of the petition herein.); that such plan "will prevent competition within each service plaza between distributors of gasoline and other petroleum products, and will establish a monopoly within each such area, all to the detriment of the public interests" in violation of the provisions of **Chapter 5537 R. C.** requiring the establishment in each service area of competing gas stations in the public interests; that such plan by preventing reasonable competition in each service area deprives the plaintiff of the right and opportunity to compete with gasoline distributors in said turnpike and of plaintiff's property rights without due process; constitute an unlawful and arbitrary exercise of power; impose an unwarranted, unreasonable and unlawful burden on Interstate Commerce; and are invalid and void;

That the Notice to Bidders as to "service plazas" one, seven and eight contains a requirement that the successful bidder will be required to sell both "regular" and "premium" gasoline at each gas station covered by the contracts of the successful bidder; that for more than thirty years plaintiff has manufactured, distributed and sold but one grade of gas known as "Sunoco"; that "Sunoco" is a "premium" gasoline which is sold at the price of "regular" gasoline; that plaintiff's gasoline receives wide acceptance by the motoring public and enjoys large customer demand; that since 1948 plaintiff has been the second largest distributor in volume in the State of Ohio through retail service stations (The petition also recites the amount of gasoline taxes and other taxes paid to the State of Ohio by plaintiff, the number of Sunoco filling stations in Ohio and the volume sales of Sunoco gasoline and Sunoco motor oil in the past fiscal year); that by such notice to bidders defendant has prevented plaintiff from bidding on Contracts SS-1, SS-7 and SS-8; that such action of the defendant "deprives the plaintiff of the right and opportunity to make available to motorists travelling on said turn-

pike plaintiff's Sunoco products, deprives the very substantial number of motorists customarily using Sunoco gasoline of the right and privilege of purchasing Sunoco gasoline along said turnpike, and deprives plaintiff of the right and opportunity to compete with gasoline distributors along said turnpike selling both 'premium' and 'regular' gasoline"; deprives plaintiff "of its property rights without due process of law, constitutes an unauthorized assumption of power and an arbitrary, unreasonable, discriminatory, capricious and unlawful exercise thereof, and imposes an unwarranted, unreasonable and unlawful burden on interstate commerce, all to the great injury to the public, and particularly to the motoring public, and upon plaintiff."

Plaintiff prays for a temporary injunction (a) prohibiting the defendant from executing or delivering to the successful bidders the contract designated SS-2, SS-3, SS-4, SS-5 and SS-6 and from performing said contracts, (b) from accepting or considering any bid filed with defendant for contracts SS-1, SS-7 and SS-8 and from awarding or entering into any contracts based on such bids and (c) from including in any future Notice to Bidders any requirement that the successful bidder shall sell more than one grade of gasoline at gas stations covered by such contracts (plaintiff's motion for temporary injunction was denied by this Court—See decision of December 22, 1954 and entry of December 23, 1954—after hearing of December 10, 1954); "that, on final hearing, said temporary injunction be made permanent"; that a mandatory injunction issue ordering, commanding and directing defendant (a) to authorize and provide for the establishment of two or more competing gas stations or distributors on each side of said turnpike within each of the eight service plazas or areas; (b) to authorize, accept and consider bids for contracts for gas stations submitted by plaintiff or any other gasoline distributor, marketing but one grade of gasoline; and to omit from all Notices to Bidders terms and conditions of bidding, contracts for the operation of gas stations and all similar and related documents any conditional requirement that the successful bidder will be required to sell both "regular" and "premium" gasoline. The petition also prays "for such other and further relief, either temporary or permanent, as equity and good conscience may require in the premises."

From a detailed study of the petition and the briefs, it is apparent that plaintiff is making two basic contentions which, in effect, are completely separate and distinct "causes of action" although not so separately stated and numbered. The first contention is that the provisions of **Chapter 5537, R. C.** (and particularly §5537.13 R. C.) requires that the defendant provide competing gas stations (Plaintiff's brief asserts that there must be at least two) within each service area. It is not the contention of the plaintiff that the defendant should award 16 contracts instead of 8 (While there are but 8 "Service Plazas," there are 16 service areas, each "service plaza" consisting of two service areas located adjacent to each other separated by the travelled portion of the turnpike and the dividing strip). Its position instead appears to be that while there was no illegality in calling for bids on a "service plaza" basis, the illegal action of the defendant consisted of the defendant's awarding of a contract as to each service area to but **one** bidder instead of awarding contracts as to each service area to at least **two** bidders.

Plaintiff's second contention pertains only to contracts for "service plazas" 1, 7 and 8, as to which defendant in its Notice to Bidders provided that the successful bidders would be required to sell both "regular" and "premium" gasoline in each station. As to the bids accepted by the defendant as to "service plazas" 2, 3, 4, 5 and 6, the petition does not allege that any so accepted were other than the "best bid" received (See §5537.13 R. C.), or that the receipt of bids from sellers of but one grade of gasoline were rejected on any basis except the price bid. While, in the consideration of this demurrer, we are limited to a consideration of the facts alleged in the petition, we might note parenthetically that the evidence presented to us at the hearing for a temporary injunction disclosed that contracts SS-2, SS-3, SS-4, SS-5 and SS-6 in each case was awarded to the bidder whose bid provided for the greatest payment to the defendant for the concession of selling gas and oil products at the location in question. While the defendant no doubt would have rejected the bid of the plaintiff had it been the highest bid, in view of the fact that it did reject the bid of another oil company as to contracts SS-7 and SS-8 where such company sold but a single grade of gasoline, the petition does not allege that plaintiff had submitted as to any contract the highest bid or even the second highest bid. Again, as a matter of fact, as shown in the evidence at the previous hearing, plaintiff's bids were not the highest bids or even the second highest in any case.

Reference has been made to the fact that the petition does not allege that plaintiff was even the second highest bidder in view of the fact that plaintiff asserts in its other basic claim that the statutes of Ohio require the establishment of at least two competing gas stations in each service area. Even if plaintiff be correct in this respect, a question which will be discussed hereafter, is it not the second highest bidder and not the plaintiff who has been aggrieved by the action of the defendant in awarding but one contract as to "service plazas" 2, 3, 4, 5 and 6, and is it not the second highest bidder, if anyone, who would have a cause of action to compel the awarding of such contract for a second gasoline station? We are inclined to believe so but in view of other conclusions reached in this decision, it is not necessary to decide this question.

The demurrer of the defendant specifically raises (1) the question of the capacity of the plaintiff to sue in its own name for injunctive relief (a) as "a taxpayer for and on behalf of itself and other taxpayers of the State of Ohio" or (b) "as a corporation engaged in the business of refining, manufacturing, distributing or selling petroleum products, including gasoline, motor oil and other products ordinarily used in the operation of gasoline-powered or diesel-powered motor vehicles," (2) the question of whether **Chapter 5537 R. C.**, and particularly §5537.13 R. C. of such chapter requires defendant to provide for at least two competing gasoline stations in each service area (3) the question of whether the petition has alleged any facts supporting its conclusions of law to the effect that the action of the defendant as to the Notice to Bidders for contracts SS-1, SS-7 and SS-8 is arbitrary, unreasonable, discriminatory, capricious, that it deprives plaintiff of its property without due process of law and imposes an unwarranted, unreasonable and unlawful burden

on interstate commerce and thus is unlawful and (4) the question of whether, in any event, there is a defect in parties defendant in that the successful bidders as to contracts SS-2, SS-3, SS-4, SS-5 and SS-6 are not parties to this case.

The briefs of the parties contain some discussion as to whether or not plaintiff's right, if any, to successfully maintain this action either (1) as a taxpayer on behalf of itself and other taxpayers or (2) as a corporation engaged in the business of refining, manufacturing, distributing or selling petroleum products, is actually a question of **legal capacity** to sue or whether such questions are not included in the question of whether the petition states a cause of action (in favor of the plaintiff). Since defendant has demurred on both grounds, it makes no practical difference in this case. While the distinction is one of legal theory, it would appear that our Supreme Court over the years has not carefully distinguished between the two theories. In **State ex rel Masterson v. Ohio State Racing Commission, 162 Oh St 366,** the Court speaks of a taxpayer lacking "legal capacity" to institute an action to enjoin the expenditure of public funds where he has no special interest in such funds (the funds being derived from a special class of taxpayers, those persons placing bets at the racetrack). The case of **State ex rel Spiker v. Industrial Commission, 141 Oh St 174,** is authority for the proposition that a demurrer on the ground that the petition does not state facts which show a cause of action does not raise the question of plaintiff's legal capacity to sue. This case, however, does not discuss exactly what is meant by "legal capacity" to sue. On the other hand, in **State ex rel Newell v. Brown, 162 Oh St 147,** the Court considered and passed upon the question of whether the relator therein had the "capacity or qualification which entitles him to maintain this action" under a demurrer alleging that the petition did not state facts which show a cause of action. Similar reasoning appears to have been adopted in **Buckingham v. Buckingham, 36 Oh St 68,** where it was held that the objection that the cause of action for which the plaintiff sued, was assigned before the commencement of the action, did not relate to the capacity of the plaintiff to sue but to the fact that the right of action sought to be enforced was not in the plaintiff. See also **Board of Education v. Guy, 64 Oh St 434.**

Whether we speak of "lack of capacity" to sue or whether we speak of no cause of action being stated in favor of the plaintiff for the reason that plaintiff is not the "real party in interests" (§2307.05 R. C.), the end result is the same. It appears to me from a review of the many cases cited by the parties and others that the two theories have become almost inseparably entwined in the Court's thinking. Where a party, not under any legal disability, has stated a cause of action in favor of himself (or in a permissive class suit in favor of the class he represents), it would appear that the courts have rather uniformly upheld his right to sue, thus holding that he had the "capacity" to sue and that he was the "real party in interest." Conversely where he has no justiciable interest in the matter attempted to be litigated, his attempts to sue have been rejected on either or both of the grounds that he did not have "legal capacity" to sue or that he was not the "real party in interest."

This rationalization becomes especially important in "class suits" and

particularly "class suits" against governmental entities and public officials. Here we are met with the sometimes conflicting principles that all government is instituted for the benefit of its citizenry and that any citizen has an interest in compelling public officials to obey the laws which regulate or prescribe their duties, and the theory that, in order to make government work efficiently, public officials should not be subject to constant judicial interference and a multiplicity of suits and that the solution to most grievances against public officials is through the ballot box or by public opinion. Out of this potential conflict has evolved the principle that **ordinarily** in the absence of a statute conferring such right, ordinary private citizens must possess something more than a common concern for the obedience to laws before they will be permitted to maintain injunction suits against public officials. 28 Am. Jur. 353. There of course are even exceptions to this general rule. See **State ex rel Newell v. Brown, 162 Oh St 147,** where a "citizen" was permitted in an action in prohibition to test the constitutionality of a statute pertaining to the method of filing nominating petition for judicial office in Cuyahoga County. The court there in effect held that such an election provision, by its very nature, affected all citizens generally and allowed such action "as a matter of public policy." There are, of course, many decisions both in and out of Ohio which uphold the right of a taxpayer to sue public officials or public bodies to enjoin illegal conduct or compel legal conduct on the basis that the expenditure of tax revenues was involved therein and that the plaintiff otherwise would be affected in his capacity as a taxpayer by illegal diversion of tax funds. By suing as a taxpayer, although sometimes potentially injured in such capacity to almost a minute degree, plaintiffs have been enabled to maintain actions raising a multitude of questions, not necessarily involving the payment of taxes. For example (and many others could be cited), the Supreme Court in **Kraus v. City of Cleveland, 163 Oh St 559,** decided June 29, 1955, in effect, passed on the merits of an assertion by a taxpayer that the fluoridation of the Cleveland Water Supply was (1) an infringement of the constitutional liberties of the citizens of such municipality and (2) an exercise of power in contravention of the general laws in relation to adulteration or the practice of medicine. The Court rejected both claims.

In all these taxpayers' suits, however, the courts have uniformly insisted that plaintiff must show that the alleged illegal action involved the expenditure of some monies raised by taxation to which he, as a taxpayer, contributed. This was the basis of the denial of the capacity of the plaintiff to maintain the action in **State ex rel Masterson, a taxpayer, v. Ohio State Racing Commission, 162 Oh St 366.** There, the plaintiff as a taxpayer sought to restrain the Racing Commission from expending funds or issuing permits for the conducting of horse racing in this state. The funds there involved had been appropriated by the General Assembly for that purpose. The appropriation, however, was not from general tax revenues of the state but from "the State Racing Commission Fund" established by §3769.10 R. C. All of the income into such fund came from the taxes, fees and income due the State of Ohio "under the provisions of this Act" (The Racing Commission Act). We quote from the opinion of Weygandt, C. J. at page 369:

"From these provisions it is apparent that the respondent commission is not authorized to expend public funds in excess of the revenues it collects from a special class of taxpayers. It is clear, too, that no part of such expenditures can involve funds collected from taxpayers generally. Furthermore, the relator does not claim to be in the special class of taxpayers from whom these revenues are collected.

Hence, as held by the lower courts, the relator taxpayer has no special interest in the funds here involved, and he lacks the legal capacity to institute this action."

The instant case appears to be a much stronger for denying the capacity of a taxpayer to sue than was the Masterson case. There the fund in question was derived from taxation but taxation as to a special class of taxpayers whereas plaintiff sued as a general taxpayer. If plaintiff therein as a general taxpayer had no "special interest" in the funds there involved because such funds were derived from a special class of taxpayers, it should be obvious that plaintiff herein as "a taxpayer for and on behalf of itself and all other taxpayers of the State of Ohio" would have no "special interest" in the funds of the Turnpike Commission which are not derived from any type of taxation. All of the funds of the Turnpike Commission are derived solely from the sale of bonds and the receipt of tolls from motorists using the turnpike after it is opened, together with receipts of funds from persons using the turnpike on a concession basis for the sale of products and services. See §§5537.04 (F) and (G), 5537.08, 5537.11 and 5537.13 R. C.

This decision by the Supreme Court in the Masterson case is in accord with the majority rule in this respect in this country. See 52 Am. Jur. 6 and 131 A. L. R. 1230.

In view of the decision of the Supreme Court in the Masterson case, we believe it clear that plaintiff cannot maintain this action as "a taxpayer for and on behalf of itself and all other taxpayers of the State of Ohio." Neither he nor any other taxpayer in the state has a sufficient interest in the issues here involved to maintain such action. Thus plaintiff in such capacity is not the "real party in interest" and as such has no "capacity" to maintain this action.

The question of whether plaintiff as a refiner, manufacturer, distributor and seller of petroleum products in Ohio, has a sufficient interest to maintain this action presents a much more difficult question. It should perhaps be noted that plaintiff brings this action in such capacity not as a class suit (the only class being referred to being that of "all other taxpayers" in Ohio) and that the suit is brought in its own name and not brought by the State of Ohio on the relaion of the plaintiff.

Many cases are cited by the plaintiff in support of its claim of right to bring this suit in this capacity and defendant attempts to distinguish many of these cases on the ground that they were actions in mandamus or prohibition in which the State was the plaintiff on relation of the particular person instituting the action. In this day of liberal construction of the pleadings and particularly when coupled with plaintiff's prayer for "such other and further relief, either temporary or permanent, as equity and good conscience may require in the premises," we do not believe

that any technical distinction should be drawn between the remedy plaintiff seeks, injunction and mandatory injunction, and other potential remedies. In passing upon the question of plaintiff's "legal capacity to sue" or whether he is the "real party in interest," we believe that it becomes necessary to determine what rights or privileges, if any, of the plaintiff have been injured by the activities of the defendant. If plaintiff's rights have been so injured by the defendant, it would appear that he would have the right to maintain this action. On the other hand if his rights have not been injured by the actions of the defendant, he would not have the right to maintain this action. Thus we believe that in order to determine this question we necessarily must look to the "merits" of this case in order to determine whether the defendant has violated the law and if so, whether the plaintiff has been injured thereby.

As heretofore noted, the first contention of the plaintiff is that the provisions of **Chapter 5537, R. C.,** and particularly **§5537.13 R. C.** of such chapter, requires the defendant to provide for at least two competing gasoline stations in each service area.

Sec. 5537.13 R. C. insofar as pertinent, reads as follows:

"The commission is hereby authorized to fix, revise, charge, and collect tolls for the use of each turnpike project and any extension or sections thereof, and **contract in the manner provided by this section with any person, partnership, association, or corporation desiring the use of any part thereof, including the right of way adjoining the paved portion, for placing thereon** telephone, telegraph, electric light, or power lines, **gas stations,** garages, stores, hotels, and restaurants, or for any other purpose, and fix the terms, conditions, rents, and rates of charge for such use, provided that no toll, charge, or rental is made by the commission for placing in, on, along, over, or under such turnpike project, such telephone, telegraph, electric light, or power lines, equipment, or facilities as are necessary to serve establishments located on the turnpike project or to interconnect any public utility facilities, **and provided that a sufficient number of gas stations may be authorized to be established in each service area to permit reasonable competition by private business in the public interest.**

"**Contracts for the operation of gas stations,** garages, stores, hotels, restaurants, parking facilities, or other purposes **shall be made in writing with the bidder whose bid, in consideration of the public interest, is determined by the commission to be the best bid received,** after advertisement for two consecutive weeks in a newspaper of general circulation in Franklin county, and in such other publications as the commission determines. Such notice shall state the general character of the operation proposed, the place where plans and specifications may be examined, and the time and place of receiving bids. Bids shall contain the full name of each person or company interested in them, and shall be in such form as the commission requires. The commission may reject any and all bids. All contracts shall be preserved in the principal office of the commission. * * *" (Emphasis added.)

In our decision of December 22, 1954, denying plaintiff's motion for a temporary injunction, we stated:

"Plaintiff contends that the word 'may' in the text in which it is

employed in the language 'and, provided that a sufficient number of gas stations may be authorized to be established in each service area to permit reasonable competition by private business in the public interest' is mandatory, citing many cases where the word 'may' has been judicially construed to mean 'shall' or 'must'. Plaintiff argues that unless the language is mandatory, it is meaningless since the statute by other language had already given the defendant the authority to contract for the placing of gas stations. Defendant asserts that the word 'may' should be given its ordinary grammatical meaning; that in §5537.13 R. C. the word 'shall' appears not less than a dozen times, indicating that the General Assembly by the use of 'may' did not mean 'shall'; and that in other portions of the Turnpike Act there are similar cases of duplicating of language granting authority to the Turnpike Commission.

It is fundamental, of course, that the word 'may' in its grammatical sense is not mandatory and that a mandatory construction is only followed where the sense of the entire statute under consideration impels such a conclusion. With such a test in mind, it would appear doubtful to this branch of the Court as to whether the language under consideration could be considered as imposing a mandatory duty on the part of the defendant to place competing gas stations in each service area. It appears to us that the inclusion of such language does not necessarily indicate a duplication of a grant of authority nor the inclusion of meaningless language, even if such language be construed as being permissive in character. It might easily be construed as forbidding the defendant from legally granting to any one gas station the exclusive franchise to sell at a particular service area to the extent that the defendant would be precluded from electing to place another gas station therein, a matter which at least would not be free from doubt had such language not been included. It might also be construed as authority to expend monies for additional lands or additional buildings for the placement of competing gas stations, such authority in the absence of such language being open to question in that with a 'captive' customer potential, it could be asserted that the income of the defendant would not be increased by such additional stations, that the increased expendtitures for such competing stations would be a mis-application of funds, and that the commission in the exercise of its right of eminent domain would have no authority to acquire such additional land as might be needed for such competing gas stations."

After a complete study of the briefs of the parties filed on behalf of and contra to the demurrer and of the cases cited therein, we are still of the same opinion. All of the cases cited by the plaintiff in which the word "may" was construed as meaning "shall" or "must" in our opinion are clearly distinguishable from the particular language herein employed. The language here in question does not read "provided that a sufficient number of gas stations shall be authorized" or "provided that a sufficient number of gas stations be authorized." It reads "Provided that a sufficient number of gas stations **may be authorized** to be established."

Of some importance, although not necessarily controlling, are the additional considerations that throughout the Turnpike Act the General

Assembly made abundant use of the word "shall" in all of those cases where it clearly appeared that they were imposing a mandatory duty, and the principle that administrative practice and interpretation will not be overturned except for very cogent reasons, if the scope of the command is indefinite or doubtful. As stated by the Court of Appeals of this district in **Miami Conservancy District v. Bucher, 87 Oh Ap 390, 397**, citing Fawcus Machine Co. v. United States, 282 U. S. 375:

"The practice has peculiar weight when it involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new."

In this connection we might state parenthetically that it appears from our opinion of December 22, 1954, that at least as early as February, 1953, discussions were had between defendant and a committee representing the petroleum industry in which the committee took the position that under the language of §1214 GC (now §5537.13 R. C.) it was mandatory that the defendant provide for at least two competing gas stations in each service area. Despite the fact that the defendant took a contrary position, we may take judicial notice of the fact that the Ohio General Assembly met in 1953 and again in 1955 and no amendments were made to the statute in question. If, as contended by plaintiff, the General Assembly actually meant "shall" where it said "may" it would seem that the more direct method of undoing this legislative mistake would be for the General Assembly, itself, to make such change, if actually such was its purpose.

Much reference has been made by the plaintiff to the language in §5537.13 R. C. "in the public interest." Apparently it is the contention of the plaintiff that a "monopoly" is inherently obnoxious and thus against the public interest. While monopolies in the ordinary commercial field may be considered as such, we know of no fundamental principle which would make "monopolies" against the public interest where such "monopolies" consist of a concession to sell products or service on the land of another, including the lands of a political entity. Cases relating to the attempted exercise of the police power to create "monopolies" have no application to the issue here presented for the very fundamental reason that the defendant herein is not purporting to exercise any police power in contracting with gas and oil companies for concessions on the turnpike but instead is merely exercising its power to **contract** as provided by statute.

Plaintiff refers to certain language of Lord Mansfield to the effect that "Where an act is of the essence of the thing required by a law, or, in other words, where it is essential to accomplish the object and intent of the law, it is imperative and cannot be dispensed with." As we construe the entire Turnpike Act, the **essence** of the thing required by the law is not the providing of private competition for sales on the turnpike but the construction and operation of the turnpike as a toll road for the expeditious moving of traffic within the State of Ohio.

We turn now to a consideration of whether the action of the defendant in providing in its Notice to Bidders that the successful bidder on contracts SS-1, SS-7 and SS-8 should sell both "regular" and "premium"

gasoline, constituted an abuse of discretion on the part of the defendant. Stated more accurately, the issue presented is whether the **facts** alleged in the petition show such to have been an abuse of discretion.

Plaintiff's brief cites many cases holding that certain attempted exercises of the police power by municipalities or other political subdivisions were unlawful and unconstitutional as discriminating between businesses of the same character or unduly interfering with a person's fundamental right to do business. As to all of these cases, we believe it clear that they have no application to the question presented here as they deal with the scope of the "police power" and not with the question of the power of a political entity in its own right to contract for services or products.

One case which does deal with such a contractual right is **State ex rel United District Heating, Inc., v. State Office Building Commission, 124 Oh St 413 and 125 Oh St 301.** In that case the Supreme Court held that the Building Commission could not legally deny a contract to the low bidder solely upon the basis that he did not employ all Union labor. While this case does illustrate that the courts, even as to contractual matters in which a political entity is a party to such contract, will interfere to prevent an abuse of discretion, we do not believe that it is in point on the fact pattern here presented.

In **State ex rel Shafer v. Ohio Turnpike Commission, 159 Oh St 581,** the Court held that the Ohio Turnpike Act invests the Ohio Turnpike Commission with discretion **if acting in good faith** to determine the design, plans and specifications for a highway to be constructed by it and to determine the material of which such highway is to be constructed. In that case a claim was made that the Turnpike Commission had abused its discretion by entertaining bids calling for the use of concrete and thus precluding any bids for the use of bituminous material. We quote from the opinion of Middleton, J. at page 590:

"The rule is generally accepted that, in the absence of evidence to the contrary, public officers, administrative officers and public boards, within the limits of the jurisdiction conferred by law, will be presumed to have properly performed their duties and not to have acted illegally but regularly and in a lawful manner. All legal intendments are in favor of the administrative action. 42 American Jurisprudence, 689, Section 240; **Bloch v. Glander, Tax Commr., 151 Oh St 381, 86 N. E. (2d), 318; State, ex rel. Gerspacher, v. Coffinberry et al., Industrial Commission, 157 Oh St 32, 104 N. E. (2d), 1; Wheeling Steel Corp. v. Evatt, Tax Commr., 143 Oh St 71, 54 N. E. (2d), 132.**

"Abuse of discretion by the commission is not specifically charged, but the charge of acting 'arbitrarily' and 'without the exercise of discretion' means 'abuse of discretion' if anything. Reference to a few of the many available decisions will suffice to demonstrate the general understanding of abuse of discretion.

" 'The exercise of an honest judgment, however erroneous it may seem to be, is not an abuse of discretion. Abuse of discretion, and especially gross and palpable abuse of discretion, which are the terms ordinarily employed to justify an interference with the exercise of discretionary power, implies not merely error of judgment, but perversity of will,

passion, prejudice, partiality, or moral delinquency.' People v. N. Y. C. Rd. Co. 29 N. Y., 418, 431, quoted from in **Alliance v. Joyce, 49 Oh St 7, 22, 30 N. E. 270,** by Dickman, J.

" "The meaning of the term "abuse of discretion" in relation to the granting of a motion for a new trial connotes more than an error of law or of judgment; it implies an unreasonable, arbitrary or unconscionable attitude on the part of the court.' **Steiner v. Custer, 137 Oh St 448, 31** N. E. (2d), 855.

" "* * * it must be kept in mind that the term "abuse of discretion" means more than an error of law or error of judgment * * *. It means "a discretion exercised to an end or purpose not justified by, and clearly against reason and evidence" * * *. Where the court does not exercise a discretion in the sense of being discreet, circumspect, prudent and exercising cautious judgment, there is an abuse of discretion. * * * The term has been defined as a "view or action that no conscientious judge, acting intelligently, could have honestly taken." ' **State, ex rel. Wilms, v. Blake et al., Industrial Commission, 144 Oh St 619, 60 N. E. (2d) 308.** A similar statement appears in **State v. Ferranto, 112 Oh St 667, 676, 148 N. E. 362."**

Having the power under §5537.13 R. C. to determine in consideration of the public interests "the best bid received" it is clear from the Shafer case that the Commission may determine even in advance of the submission of bids the requirements of such bids unless in so doing they are guilty not merely of an error in judgment but of taking an action which amounts to a perversity of will, passion, prejudice, partiality or moral delinquency.

Applying these tests to the plaintiff's petition it is our opinion that the petition fails to state a cause of action. While the petition alleges that plaintiff is the second largest gasoline distributor in volume in the State of Ohio there is no allegation in the petition as to the number or the percentage of the buying public which buy or are accustomed to buying gasoline at stations which sell but one grade of gas as opposed to those selling two grades of gas. As a matter of fact as noted in our decision of December 22, 1954, the action of the defendant was based upon the recommendation of a committee who expressed the opinion "that the public will not be well served unless each of the service stations shall offer to all motorists both the regular and premium grades of gasoline, such as are offered at the great majority of the better service stations all over the country."

As we see it, the issue presented herein is not the relative merits of plaintiff's gasoline as contrasted with other gasolines or the question of why anyone would pay a higher price for "premium gasoline" from other distributors when it could purchase the same quality of gasoline at a lower price from the plaintiff. The issue rather is whether the **defendant** may legally take into consideration the buying habits of the substantial majority of the motorists who will patronize the turnpike after it is open to travel, without regard to whether such buying habits are reasonable or unreasonable, and require that each of the gas stations located on the turnpike provide that which the substantial majority, by its buying habits, has indicated that it desires. The issue is not

what would this Court have done if it were a member of the Turnpike Commission, but rather whether the action of the defendant was the exercise of an honest judgment in good faith and not totally without reason.

It must be remembered that the primary object of the Turnpike Act is to provide a highway which will have as few obstacles to the free and swift movement of traffic as possible and this, of course, necessarily results in the number of gas stations, restaurants, etc. available to the motorists, being much fewer than would ordinarily be available on the usual public highway, and as a practical matter, making it impossible to satisfy the possible desires or demands of all motorists. Can we say, therefore, that the determination of the defendant that each gas station should come as close as possible to satisfying the apparent customer demands of the majority of the motorists is an action which no reasonable person or group of persons could honestly take? We do not believe so. The fact that wiser administrative judgment might have resulted in another course of action is not the issue.

Starting, as we must with the presumption that the defendant acted in a lawful manner, we find no facts alleged which would negate such presumption. While technically the recommendation of the special committee to the defendant is not before this Court on the demurrer, we can and do predicate our opinion on the fact that the petition fails to allege facts as to the relative buying habits of a majority of the Ohio motorists or other motorists. An allegation to the effect that plaintiff is the second largest distributor of gasoline in Ohio, that it had a certain number of gas stations and sold a certain volume of gas does not, in the absence of comparative figures for (1) all single grade gas dealers and (2) all "regular" and "premium" grade gas dealers, indicate the buying habits of the motorists who will patronize the Ohio Turnpike. Admitting all of the factual allegations of the petition to be true, we conclude that no facts are alleged which would rebut the presumption of lawfullness as to the action of the defendant.

Being of the opinion, as heretofore stated, that the petition failed to state a cause of action in favor of the plaintiff, either on the issue of competing gas stations within one service area or on the issue of the requirement of sale of "regular" and "premium" gasoline, it is not necessary for us to pass upon the question of whether there is a defect of parties defendant. It would appear from the briefs of the plaintiff that it has abandoned any claim to an injunction prohibiting the performance of contracts SS-2, SS-3, SS-4, SS-5 and SS-6. If this be true, there would be no defect in parties defendant but if this be not true, we are of the opinion that the rights of such successful bidders in these contracts could not be foreclosed in an action in which they were not a party. There is some question as to whether the petition seeks such relief in view of the fact that it could only be included in the language of the prayer asking that the temporary injunction be made permanent and since the motion for a temporary was denied and thus cannot be made permanent, we are inclined to the belief, based upon the language of plaintiff's brief, that plaintiff does not now seek such injunctive relief against the enforcement of contracts SS-2, SS-3, SS-4, SS-5 and SS-6.

In view of this possible ambiguity in the petition, however, and having heretofore determined that the petition does not state a cause of action in favor of the plaintiff, this question need not definitely be determined.

For the reasons heretofore stated the demurrer of defendant to the petition is sustained. Entry may be prepared accordingly.