**CLEVELAND RACEWAYS, INC. et, Plaintiffs, v. BOWERS et, Defendants.**

Common Pleas Court, Franklin County.

No. 202125. Decided October 30, 1958.

536

Edward Ginsberg, for plaintiffs.
William Saxbe, Atty. Genl., Hugh A. Sherer, Chief Counsel, Chester Hummell, Asst. Atty. Genl., for defendants.

## OPINION

By SATER, J.

### HEARD ON DEMURRER TO PLAINTIFF'S PETITION

Seven plaintiffs have joined in seeking relief against four State officials, defendants. The plaintiffs are all race track operators duly licensed by the proper State administrative agency to do business in Ohio pursuant to Chapter 3769 R. C.; they are Cleveland Raceways, Inc. (Cranwood-Warrensville Heights), Thistledown Jockey Club, Inc. (North Randall), Ascot Park Jockey Club, Inc. (Cuyahoga Falls), Beulah Park Jockey Club, Inc. (Grove City), Hamilton Raceway, Inc. (Hamilton), Randall Park Jockey Club, Inc. (North Randall) and River Downs, Inc. (Cincinnati). The defendant State officials are Stanley J. Bowers, Tax Commissioner, James R. Hay, Director of Agriculture, James Rhodes, Auditor and Roger W. Tracy, Treasurer.

In their petition plaintiffs say that they conduct and have conducted in Ohio, running type race horse meetings at which pari-mutuel betting is authorized, all under §3769.08 R. C. (For the last twenty-five years Ohio has had what was originally styled in 115 Ohio Laws 171, "The Horse Race Act," now Chapter 3769 R. C., referred to above; its sections here relevant have been amended several times.) They say that the Legislature enacted a bill entitled "An Act to Amend §§3769.08 and 3769.10 R. C., and to enact Supplemental §3769.082 R. C., and they attach to their petition, as Exhibit A thereto, Supplemental §3769.082 R. C., which to them is the key portion of the Act and chapter here relevant. (For the benefit of the reader, this particular Act appearing in Exhibit A was passed in 1957, is entitled Amended House Bill 617, is found in 127 Ohio Laws at page 800 et seq., and carries the purpose statement "to amend §§3769.08 and 3769.10 R. C., and to enact Supplemental §3769.082 R. C., relative to the creation and administration of a fund for the aid of state, county and independent fairs"—terminology never previously found in any legislation connected with either The Horse Race Act or present Chapter 3769 R. C.) They say, and their allegation should be carefully noted, that this Act levies a tax of 0.5 percent of the total of all monies wagered through the pari-mutuel betting at their respective tracks; but let it be noted that their carefully drawn, lawyer-like petition makes not statement or allegation against whom this tax is levied, nor is it alleged that the money wagered and then taxed was owned by plaintiffs. Under these particular statutory sections, §§3769.082 and 3769.08 R. C., they say that the seven paid $418,260.06 in 1957, and that only three of them have so far paid in 1958, $110,039.14. They say that it is the purpose (but see above) of §3769.082 R. C., to take "revenue"—an interesting use of that word—from running race tracks, including those operated by these plaintiffs and to use it for the direct benefit of tracks running the harness type of race; and that the levies and tax of this section are not used for the purposes set forth in the Ohio Constitution, but are used for the "pri-

vate"—again, interesting semantics—purpose of supplying purses to be paid to owners of horses running in harness races. They say that this 0.5 percent tax violates **Article XII, Sections 4 and 5, Ohio Constitution,** in that it is not levied for any public purpose of State or County nor to defray expenses of the State but to provide purses for privately promoted harness races. (But they do not in any wise allege or say that their own running races are **publicly** promoted.) They say that the statute levying the tax does not distinctly define the object (see again above) toward which the taxes are to be applied but allows the tax, in addition to the purses, to be used for agricultural societies without limitation. They say, but without quoting, that none of the purposes expressed in the statute have any reasonable relation to public health, morals, safety or necessity. They further say that this statute. §3769.082 R. C., violates **Section 26, Ohio Constitution,** in that the statute's sub-section C delegates to defendant director of agriculture, power vested only in the General Assembly by virtue of which such director may order the Auditor of State to allocate and pay to some county and independent agricultural societies more money for purses than to other such societies. That the statute is unconstitutional as being confiscatory, discriminatory and void in that it establishes a minimum of $1000.00 for purses for harness races raised in substantial part by a tax on permit holders (presumably plaintiffs inter alia) who, for economic reasons, are unable to maintain a similar minimum level for purses. They say that **sub-section J** of that statute unlawfully delegates powers, apparently to county and independent agricultural societies, of the General Assembly in that the only penalty for their misuse of funds paid to them in the manner set out immediately above herein deprives them automatically of the privilege of participating in the "Ohio fairs fund" for a "period of two years after such misuse of such moneys occurs." They further say that §3769.082 (D) R. C., contravenes **Article II, Section 22, Ohio Constitution,** by providing for withdrawals of money from the State treasury, not in pursuance of specific statutory appropriation, by providing that all moneys in excess of that needed to execute the statutory stated purposes shall be distributed equally each year wherein such a surplus occurs to those county and independent agricultural societies that conduct horse and colt racing stakes under sub-section (C) of the statute but with no set period of time within which to make such distribution unless it be within the two immediately subsequent years. They further say that by making a distinction that is capricious, and without reasonable or logical bases between running and harness racing and race tracks, §3769.082 **R. C.,** violates **Article I, Section 2, Ohio Constitution,** and Amendment XIV of the Federal Constitution; and that by failing to set forth reasonable standards (unspecified unless we assume that earlier allegations are referred to) and by being arbitrary and discriminatory, it denies to plaintiffs the equal protection of the laws guaranteed by both State and Federal Constitutions. After stating that plaintiffs paid the sums of money referred to above under protest, plaintiffs pray for a declaratory judgment that the part of §§3769.082 and 3769.08 R. C., which tax these plaintiffs as stated above and allocate the proceeds of the tax to the "Ohio Fairs Fund" are unconstitutional and void, that defendants be ordered

to refund to them respectively the taxes so paid by plaintiffs and that they be awarded costs and other proper relief. To this petition, defendants have demurred for the reasons (1) that plaintiffs lack legal capacity to institute this action, and, (2) that there is a defect of parties defendant.

A short preliminary history of Chapter 3769 R. C., may go far to clarify matters.

"The Horse Racing Act" embodied in Amended Substitute Senate Bill No. 103 (115 v. 171) came into being in 1933. It required a "permit" of any and all parties holding or conducting in Ohio horse race meetings for any stake, purse or award; it covered only meetings whereat pari-mutuel wagering was available. An administratrive state racing commission was established, and provision was made for application for such racing permits, for the deposit of accompanying filing fees, and for restrictions on the use of such permits. Section 8 of that bill provided for suspension of the pari-mutuel system of wagering, allowed each permittee (whether running or harness racing) to retain as "commission" not more than ten percent of all moneys wagered plus "breakage" of odd cents, and required such permittees each day to pay to the state racing commission ten per cent of the first $1000.00, fifteen percent of the next $4000.00 and twenty percent of all moneys over $5000.00. By section 10 of that bill all required taxes, fees and commissions were to be paid each month by the commission's secretary to state treasury to the credit of a separate fund, "the state racing commission fund" with any surplus from any year to be paid thereafter into the State's general revenue fund. There were appropriate penalty provisions. Statedly and clearly the sole purpose of this enactment was regulation of horse racing.

The foregoing is accurate as to Amended Substitute Senate Bill No. 372 (115 v. 367) passed three months later except that the "commission" of section 8 while remaining at ten percent was modified by the provision that each day the permittee should pay to the commission, "as a tax," ten percent of the first $1000.00, fifteen percent of the next $4,000.00, twenty percent of the next $5000.00, twenty-two and one-half percent of the next $5000.00, twenty-five percent of the next $5000.00, and thirty percent of all over $20,000.00. This modification indicates belated recognition by the legislature that it was entering the field of big business.

No change occurred in The Horse Racing Act until 1953 when two bills were made into law. The first bill was Amended Substitute House Bill No. 44 (125 v. 57). As commission, that law granted to harness racing permittees upon to fourteen percent, and breakage, of all moneys wagered daily; to running racing permittees up to twelve and three-quarters percent, and breakage, of all moneys wagered daily. From that commission both types of permittees paid daily to the tax commissioner two percent of the first $10,000.00, three percent of the next $40,000.00, four percent of the next $50,000.00, five percent of the next $300,000.00 and six percent of all over $400,000.00, all to the credit of "the state racing commission fund." Business was much bigger. The purpose of the bill was "To amend certain sections of the Revised Code relative to the taxation of funds wagered on horse racing." The second 1953 bill, Amended

House Bill No. 566 (125 v. 539), was purposed "To assess an additional tax against horse-racing permit holders for the benefit of the political subdivision," and taxed each permittee (up to $10,000.00) 0.1 percent of all moneys wagered daily for that purpose, but from this tax agricultural society permittees were exempted very much as motor vehicles hauling farm products from farm to market are exempt from the motor carrier statutes administered by the Public Utilities Commission of Ohio. Again, the sole purpose of the legislation was regulation of horse racing by means of the acquisition of suitable revenue to effectuate that regulation with any surplus eventually going into the general fund of the State.

The same is true of the 1955 Amended House Bill No. 334 (126 v. 749) purposed "To amend §3769.08 R. C., relative to the taxation of funds wagered on horse racing." Breakage remained the same but the commission to running race permittees went up to a maximum thirteen and one-half percent of all moneys wagered, and on harness racing permittees to a maximum fifteen percent; the State's tax share thereon, retained the same monetary break-points as to moneys wagered but increased the tax on each bracket thereof by 0.75 percent over the statute of 1953

Then came the big change of 1957 in Amended House Bill No. 617 (127 v. 800) entitled or purposed, as noted above, "To amend §§3769.08 and §3769.10 R. C., and to enact supplemental §3769.082 R. C., relative to the creation and administration of a fund for the aid of state, county and independent fairs"; it is called the "Ohio fairs funds" and is dispensed according to new §3769.082 R. C. This was something brand new to the Horse Race Act. This was no "state racing commission fund" as in bygone years; it was an entirely new tax, fund and purpose. The mechanics of creating, setting apart and administering this new "Ohio fairs fund" were quite simple. The 24-year old principle of breakage, commission and tax thereon were left untouched as was the administration of the state racing commission fund noted above herein. And let it be noted that to none of this have plaintiffs now or ever before objected; to the tax on what the Legislature has thrice said they may have and keep as their own, there is no protest. Their protest is directed wholly and solely to what is not theirs by law or otherwise. Thus:

By §3769.08 R. C., this law increases the commission of running race permittees to fourteen percent of all money wagered and then adds 0.5 percent to the commission of all racing permittees whatsoever on pari-mutuel wagers and provides in the next sentence for its payment each day into the new "Ohio fairs fund." Care having already been made in §3769.08 R. C., for the counties wherein such wagering is done, the use of the new "Ohio Fair fund" is consequently covered by new §3769.082 R. C. From this fund $2500.00 goes annually under paragraph (A) to each county agricultural society and each independent agricultural society for general expenses including junior club work, public school displays, livestock premiums and agricultural improvements; this would be wiped out if plaintiffs' position prevails. Under paragraph (B) $60,000.00 goes annually to the Ohio state fair for purses for described trotting and pacing races; this also would be wiped out.

By paragraph (C) $3000.00 annually to such county and independent societies as conduct horse races, mostly for purses, and $2000.00 each to at least half of such societies for trotting and pacing race purses with the minimum purse of $1000.00. This, too, would be wiped out. If there is not enough money, it is pro-rated; if there is a surplus, it also is pro-rated among such societies; i. e., "minor league" purses and expenses rise and fall in direct proportion to plaintiffs' wagering concomitant. However, by paragraph (E) none of these societies participate unless they ask to do so; and paragraphs (F) and (G) further limit the privilege of participation. Paragraph (J) debars participants for two years for misuse of any funds so given to them by the director of agriculture.

There is the history of The Horse Race Act. In considering it along with plaintiffs' petition, several factors may be noted in limine.

First. The power to tax is the power to destroy, even if plaintiffs have a property interest subject to taxation.

Second. This is an excise tax on the privilege of pari-mutuel wagering. **Saviers v. Smith, etc., 101 Oh St 132, syll. 4.**

Third. It is as such a proper tax under **Article II, Section 1** and **Article XII, Section 10, Ohio Constitution.** Syll. 1, 3 and 4 of Saviers v. Smith, supra.

Fourth. Consequently, **Article XII, Sections 4** and **5, Ohio Constitution,** need not here be considered.

Fifth. Plaintiffs are at best mere permittees whose licenses are revocable at any time under the provisions of the Horse Racing Act, and, consequently, under such permit licenses have neither contract nor property right. **State, ex rel. Zugravu v. O'Brien, 130 Oh St 23.** Of necessity, no property right can be foundationed on such a permit-license.

Sixth. Consequently, and by reason of all the foregoing, plaintiffs have no more right, title or interest in or to the sum derived from this 0.5 percent tax than do Ohio vendors in the sales tax which they collect or Ohio employers in the federal income tax which they withhold and turn over to the state or federal government respectively; all three groups are no more than conduits of revenue, and have no standing in court to challenge either the propriety or the constitutionality of the tax or of the use of the revenue derived therefrom. Parallel, does one sue the conductor (or ticket agent) of a railroad for an overcharge?

Seventh. This does not purport to be a taxpayer's suit; but even if it were, plaintiffs' petition fails utterly to show jeopardy to any property right of theirs. **State, ex rel. Masterson v. Ohio State Racing Commission, 162 Oh St 366.** See also, **Sun Oil Co. v. Turnpike Commission, 71 Abs 465, syll. 5,** and **State, ex rel. Masterson v. Ohio State Racing Commission, 97 Oh Ap 108, syll. 2.**

Eighth. The Bill of 1957, supra, by adding 0.5 percent to plaintiffs' so-called "commission" and at the same time providing for its disposition in a new manner changed completely, by addition, one of the basic purposes of the Horse Racing Act, and it did this in two interrelated inseparable steps listed above.

Ninth. By reason of all the foregoing, plaintiffs have no standing

in court, they have no cause of action, they have no choice but to pay, they have no claim to reimbursement regardless of their payment made under protest.

Tenth. If the jurisdiction of an administrative agency under one portion of the Horse Racing Act cannot be prevented, without special showing of property interest and jeopardy, as being in excess of powers conferred by statute (see **State, ex rel. Masterson v. Ohio State Racing Commission, 164 Oh St 312**), neither can a complimentary administrative agency under a statute in part materia without a similar showing; and that showing is here as absent as it is impossible, be it action in prohibiton, injunction or declaratory judgment.

Eleventh. Plaintiffs make no claim of destitution arising from the 0.5 percent tax on wagered funds that they may not keep as it passed through their pari-mutuel machines en route to the special' fund already named; but even if they did, the remedy lies with the next Legislature and not with the Court.

Twelfth. If we analyze §§3769.08 and 3769.082 R. C., in connection with the 1957 tax payments (those of 1958 are incomplete) by plaintiffs on pages 3-5 of their petition, we are forced to the conclusion either that the 1957 Legislature made an amazing blunder or that plaintiffs are fixed quite comfortably, financially speaking. Thus: §3769.082 R. C., provides for distribution of the "Ohio Fair Fund." If every possible society and agency participated, the total outlay would be close to $632,000.00. Yet the 1957 tax under §3769.08 R. C., which these plaintiffs admit having paid, amounts to just $418,250.06. But does that $418,250.06 represent the entire fourteen percent tax of that section or does it represent the 0.5 percent going to the "Ohio Fair Fund"? The petition is silent. But if it represents the full tax, only 1/28 went to the Fair Fund, viz., $14,937.51. Thus we have $14,937.51 receipts versus $632,000.00 outlay. What an astounding legislative blunder! Of if the admitted tax payment of $418,250.06 is simply the 0.5 per cent then that approaches $632,000.00 logically. And it also indicates that plaintiffs' commission was 27-fold that payment, a neat $2,927,750.42 to plaintiffs to which we may add unknown further income from horse entry fees, personal admission charges, plus concessionaire revenues!

The enumeration of these twelve foregoing factors goes far to eliminating further discussion. But let us assume, for the sake of discussion only, that plaintiffs had some sort of direct property interest in the 0.5 percent of the money which they did not at any time own but which by some strange alchemy became theirs by the mere act of passing through their pari-mutuel machines as described above. What then of plaintiffs' various constitutional claims? The result is the same. There is no merit to their case.

Take first the fourteenth amendment to the federal Constitution The regulation of slot machines violates no privilege or immunity of a citizen of the United States nor deprives him of life, liberty or property without due process, nor deny equal protection of the law. Ex parte Davis, 91 Pac. 2d, syll. 27. The privileges and immunities protected by this amendment against abridgment by state laws are not those funda-

mental privileges and immunities inherent in state citizenship, but only those which owe their existence to the federal government, its national character, its Constitution, or its laws. Ins. Co. v. Cheek, 259 U. S., 530, 539, 66 L. ed., 1044, 1052, Hamilton v. Regents, 293 U. S., 245, 261, 79 L. ed., 343, 352, **State v. McCann, 21 Oh St 198, 209-210,** and Watkins v. Oak-lawn Jockey Club, 86 Fed., Supp., 1006 (aff'd on appeal).

The power to tax the exercise of a privilege is the power to control or suppress its enjoyment. Murdock v. Penna., 319 U. S., 105, 112, 87 L. Ed., 1292, 1298. The state's power over taxation is plenary and only emphatic requirements of the Constitution may authorize interpretation of the privileges and immunities clause which restricts the power of states to manage their own fiscal affairs; i. e., the presumption in favor of the constitutionality of a state tax law can be overcome only by the most explicit demonstration that the classification adopted by the legislature is a hostile and oppressive discrimination against particular persons and classes, and the burden is on the one attacking a legislative classification or a particular field to negative every conceivable basis which might support such classification. Madden v. Kentucky, 309 U. S., 83, 84 L. ed., 590. Plaintiffs' petition here completely lacks those negatives. Since police regulations may be utilized by the power to tax, the taxing of the revenues of pari-mutuel machines may be and is as absolute as was the power to confiscate, which constitutes no denial of due process or of equal protection in Phillips v. Atlanta, 57 Fed. Supp., 588, aff'd 145 Fed. 2d, 470. To the same effect concerning equal protection, see the Oaklawn Jockey Club case, supra, which holds that the equal protection clause contemplates a purposeful and systematic discrimination designed to favor one individual or class from another, a purpose utterly foreign to Ohio's legislation of 1957, above. And the strong cases, State v. Racing Ass'n., 136 N. J. L., 173, 54 Atl. 2d, 916, Distilling Co. v. Baltimore, 216 U. S. 285, 54 L. ed., 482, and Matosin v. New York, 117 N. Y. Supp. 2d, 532.

So much for federal questions raised. Let us turn now to matters of the Ohio Constitution.

**Article I, Section 2, Ohio Constitution,** was considered adversely to plaintiffs here, in **Novelty Co. v. Evatt, etc., 145 Oh St 205, 207.** Before that had come **State, ex rel. etc., v. Wallace, 137 Oh St 379, 383, 384;** and prior to that Saviers v. Smith, supra, held that "upon the power to tax privileges and franchises there is no express limitation in the (Ohio) constitution." On the matter of classifications, the Wallace case pungently quoted, "A corporation cannot object to the use of the taxes which it pays for the maintenance of schools because it has no children." And the second syllabus of **Calerdine v. Freiberg, 129 Oh St 453,** says "There is no constitutional provision requiring the Legislature to apply an excise tax exclusively for the use and benefit of those who pay it."

**Article II, Section 22, Ohio Constitution,** which prohibits the withdrawal of money from the State treasury except in pursuance of specific appropriation by law is not in point here at all. The fund created by the tax of 0.5 percent goes into a special fund, the "Ohio fairs fund" and never becomes part of the general treasury fund until all of its specific,

special purposes have been fulfilled; thereafter, any residue enters the treasury but never again goes, as such, to such special fund. See **Fisher Bros. v. Brown, 111 Oh St 602,** which also noted on **page 618** that occasional inequalities are immaterial. To much the same effect, see **Long v. Board of Trustees, 24 Oh Ap 261.**

The same is true of **Article II, Section 26, Ohio Constitution,** which requires all laws of a general nature to have a uniform operation throughout the state. State, ex rel. v. Wallace, supra, at page 384. See **also State, ex rel. Masterson v. Racing Com'n., supra, 97 Oh Ap 108, 111, 113, Dillon v. Cleveland, 117 Oh St 258, 272,** and the Fisher Bros. case, immediately above. If plaintiffs' contention here were sustained, there would be voided the classifications inter alia of the intangible personal property tax, the corporation franchise tax, the liquor control permit fees, the retail sales tax, the use tax, the wine and mixed beverages tax, the motor vehicle license tax, the motor transportation license tax, the private motor carriers' license tax and the so-called "axle mile" tax. To state the proposition is to answer it.

Finally, plaintiffs evoke **Sections 4 and 5, Article XII, Ohio Constitution.** The controlling section of this article is **Section 10** and under it, the statutes and tax in question are proper and lawful. **Calerdine v. Freiberg, supra, 129 Oh St 453, 457-458, 460-61, Fisher Bros. v. Brown, supra, 111 Oh St 602** (on **page 622** is discussed and approved the discretionary power as to how and at what times to disburse funds realized from a tax, and the propriety of disbursing varying amounts in different years) and **Fox v. Frank, 52 Oh Ap 483, syll. 1, 2, 3, aff'd., 130 Oh St 268.**

A few minor points in closing (1). If the penalty of §3769.082 **(J)** R. C., is too weak, the remedy lies with the Legislature, not here. (2) Nor is §3769.082 **(D)** R. C., too vague as to distribution of surplus funds to agricultural societies; the statute is clear that the distribution is annual but even if there were any purportedly reasonable doubt, every possible presumption is in favor of the legislation. **Fox v. Frank, supra, 52 Oh Ap 483, 491.** The same applies to all of plaintiffs' allegations of vagueness and to the claimed unwarranted discretion lodged in the director of agriculture; if plaintiffs were correct, there would be no government, state, local or national. (3) The matter of the lack of standards in an administrative agency or official has been settled adversely to plaintiffs' contentions in parallel situations. **Weber v. Board of Health, 148 Oh St 389, Matz, Adm'r. v. Cartage Co., 132 Oh St 271,** and this Court's unreported case Re: The Adoption of Rules and Regulations Relative to Driver Training Schools, No. 200,738. (4) Since plaintiffs have neither title nor interest in the proceeds of the 0.5 percent tax, they have no basis for complaint as to the size of any particular purse or purses. (5) By the parallel token, it is no concern of plaintiffs whether either county or independent agricultural societies are public or private organizations.

(6) The prayer of plaintiffs' petition will provide no relief to those who place wagers. It will simply increase plaintiffs' profits.

Defendants' demurrer is sustained on both grounds. Submit entry in accordance with the foregoing.